**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

SHAWN TAFT,

                              Plaintiff,

              v.

RUSSELL A. FRICKE;                              No. 9:17-CV-0346
JOHN/JANE DOES,                                 (GTS/CFH)

                              Defendants.

**APPEARANCES:**                    **OF COUNSEL:**

Shawn Taft
21892-052
Allenwood Medium Federal Correctional Institution
Inmate Mail/Parcels
P.O. Box 2000
White Deer, Pennsylvania 17887
Plaintiff, Pro Se

Thuillez, Ford Law Firm                    DAISY F. PAGLIA, ESQ.
20 Corporate Woods Boulevard,
3rd Floor
Albany, New York 12211-1715
Attorneys for Defendant

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

   Plaintiff pro se Shawn Taft ("plaintiff"), an inmate, who was at all relevant times in the

custody of the Rensselaer County Jail ("RCJ"), brings this action pursuant to 42 U.S.C.

---

[1] This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28
U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c).

§ 1983 ("§ 1983").  Plaintiff alleges that defendant Russell Fricke, M.D. ("Dr. Fricke")

violated his rights under the Fourteenth Amendment.  <u>See</u> Dkt. No. 1.  Plaintiff also

alleges that unnamed defendants, John/Jane Does, violated his rights under the

Fourteenth Amendment.[2]  Presently pending before the Court is Dr. Fricke's Motion for

Summary Judgment pursuant to Federal Rules of Civil Procedure ("Fed. R. Civ. P.") 56.

Dkt. No. 47.[3]  For the following reasons, it is recommended that Dr. Fricke's motion be

granted.

---

[2] Plaintiff filed his complaint on March 27, 2017.  Dkt. No. 1.  In the more than two years that have passed since then, plaintiff has not identified the John Doe defendants and has not served process upon them. This failure is not the result of lack of opportunity.  The undersigned has extended the discovery deadline twice to accommodate plaintiff's requests.  <u>See</u> Dec. 14, 2017 Order (Dkt. No. 18); Apr. 20, 2018 Order (Dkt. No. 28).  The plaintiff has had more than two years, far more than the typical 120-day period, to identify and serve the John Doe defendants, and the Court is under no obligation to extend the deadline indefinitely.  <u>See</u> <u>Petway v. City of New York</u>, No. 02-CV-2715 (NGG)(LB), 2005 WL 2137805, at *5 (E.D.N.Y. Sept. 2, 2005) (dismissing a claim under Fed. R. Civ. P. Rule 4(m) where the <u>pro se</u> plaintiff failed to serve John Doe defendants within roughly three years of filing complaint); <u>Thomas v. Keane</u>, No. 99 Civ. 4302, 2001 WL 410095, at *1, *5 (S.D.N.Y. April 23, 2001) (dismissing a claim under Fed. R. Civ. P. Rule 4(m) where the <u>pro se</u> plaintiff failed to serve John Doe defendants within roughly two years of filing complaint); <u>Cammick v. City of New York</u>, No. 96 Civ. 4374(RPP), 1998 WL 796452, at *1 (S.D.N.Y. Nov. 17, 1998) (dismissing a claim under Fed. R. Civ. P. Rule 4(m) where the plaintiff failed to serve John Doe defendants within two years and five months of filing complaint); <u>Waldo v. Goord</u>, No. 97-CV-1385 (LEK)(DRH), 1998 WL 713809, at *5 (N.D.N.Y. Oct. 1, 1998) (dismissing a claim under Fed. R. Civ. P. Rule 4(m) where the <u>pro se</u> plaintiff failed to serve John Doe defendants within a year of filing his complaint). The undersigned, therefore, recommends *sua sponte* dismissal without prejudice of the claims against the unidentified defendants for lack of timely service.

[3] Plaintiff filed a document entitled "Motion for Summary Judgment" on April 12, 2019.  Dkt. No. 62. Plaintiff's submission fails to meet the requirements of a Motion for Summary Judgment, despite plaintiff's labeling it as such.  First, under N.D.N.Y Local Rule 7.1(a)(3), a Motion for Summary Judgment "shall contain a Statement of Material Facts.  The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue." N.D.N.Y. L.R. 7.1 (a)(3).  Plaintiff does not file a Statement of Material Facts in support of his purported Motion for Summary Judgment.  <u>See</u> Dkt. No. 62.  His response to defendants' Statement of Material Facts, dkt. no. 61, does not suffice.  Additionally, plaintiff's submission does not contain numbered paragraphs or citations to the record, as required by the Local Rules. Dkt. No. 62.  Second, the dispositive motion filing deadline expired on January 25, 2019.  Dkt. No. 46.  Plaintiff filed his purported "Motion for Summary Judgment" over two months past that deadline.  He did not request from the Court an extension of the dispositive motion deadline.  In light of special solicitude, the undersigned will construe plaintiff's submission, dkt. no. 62, as a part of plaintiff's response in opposition to defendant's Motion for Summary Judgment; however, the undersigned will not consider this submission to be a Motion for Summary Judgment for the reasons set forth herein.

## I.    BACKGROUND[4]

### A. Undisputed Facts

On July 8, 2015, RCJ admitted plaintiff as a pretrial detainee.  Dkt. No. 47-13 at ¶

4 (citing Dkt. No. 47-10 at 2).  RCJ contracts with Correctional Medical Care, now called

CBH Medical, to provide medical care at RCJ.  Dkt. No. 47-13 at ¶ 9.  CBH Medical

employs Dr. Fricke as a part-time physician at RCJ.  Dkt. No. 47-11 at ¶ 7.

While incarcerated, plaintiff visited Dr. Fricke and nursing staff.  See generally

Dkt. No. 47-9 (documenting numerous visits with nursing staff and Dr. Fricke).  After

initial booking, plaintiff received a physical exam.  Id. at 22.  Plaintiff's eyesight exam

results were 20/40, 20/40, 20/30.  Id.  Plaintiff had eyeglass when he was booked into

RCJ.  Id. at 2.  On February 9, 2016, nonparty Nurse Practioner Claudia Graham saw

plaintiff for a skin condition.  Id. at 52.  During this visit, Nurse Practioner Graham

diagnosed plaintiff with elevated blood pressure and possible hypertension.  Id.

Following this visit, medical staff checked plaintiff's blood pressure daily.  Id.  On

February 27, 2016, nonparty Dr. Irani prescribed plaintiff a daily dose of 12.5 mg. of

hydrochlorothiazide ("HCTZ") for his elevated blood pressure.  Dkt. No. 47-13 at ¶ 13.

On March 1, 2, and 8, 2016, nursing staff saw plaintiff for cough and cold symptoms.  Id.

at ¶ 14.  On March 13, 2016, nonparty Nurse Heather Holliday checked plaintiff's blood

pressure.  Dkt. No. 47-9 at 71.  During this visit, plaintiff coughed up yellow sputum and

requested antibiotics.  Id.  Dr. Fricke ordered a sputum culture, gram stain, complete

blood count, and an erythrocyte sedimentation rate to test for infection.  Id.

---

[4] Unless otherwise indicated, page citations refer to the pagination generated by this Court's electronic filing system, located at the header of each page, not to the pagination of the individual documents.

On March 16, 2016, Dr. Fricke saw plaintiff for his cough and cold symptoms. Dkt. No. 47-9 at 71.  Plaintiff had elevated blood pressure.  Id. at 71.  Plaintiff told Dr. Fricke that he had a splenectomy in the past and requested antibiotics.  Id.  Dr. Fricke performed a physical examination and obtained a chest X-ray.  Id. at 71, 77.  Dr. Fricke examined plaintiff's lymph nodes and found that they were not enlarged.  Id. at 71. Dr. Fricke determined that plaintiff was not in respiratory distress.  Id.  Dr. Fricke concluded that plaintiff was most likely recovering from a viral illness and prescribed three days of symptomatic treatment.  Id.  Aware of plaintiff's increased risk of bacterial infection from his splenectomy, Dr. Fricke agreed to prescribe antibiotics if plaintiff did not improve.  Id.

On March 17, 2016, nonparty BioReference Laboratories faxed the sputum culture test resuls to RCJ.  Dkt. No. 47-9 at 74.  The results were normal.  Dkt. No. 47-11 at ¶ 39.  On March 20, 2016, RCJ staff notified Dr. Fricke that plaintiff was not feeling better.  Dkt. No. 47-9 at 84.  Dr. Fricke prescribed amoxicillin.  Id.  On March 23, 2016, Dr. Fricke renewed plaintiff's HCTZ prescription for his high blood pressure.  Id. at 81. On April 16, 2016, plaintiff complained of shortness of breath, dizziness, and chest pain. Id. at 86.  On April 23, 2016, nonparty Nurse Practioner Jennifer Augone ordered an echocardiogram ("EKG").  Id. at 90.  On April 23, 2016, Nurse Practioner Augone informed plaintiff that his EKG showed possible ischemia, a restriction in the blood supply to cardiac tissue.  Dkt. No. 47-11 at ¶ 55; Dkt. No. 47-9 at 92.  Nurse Practioner Augone prescribed aspirin, a beta blocker, and a cardiology consult.  Dkt. No. 47-9 at 92.

On May 9, 2016, nonparty Dr. Ruslan Feygin, a cardiologist, saw plaintiff and ordered an EKG and nuclear stress test.  Dkt. No. 47-9 at 113.  On May 18, 2016,

plaintiff met with nonparty Nurse Practioner Renee Leonard.  Id. at 105.  Plaintiff was refusing his daily beta blocker as he believed it was making him lightheaded.  Id.  Nurse Practioner Leonard discontinued plaintiff's beta blocker and increased his daily dose of HCTZ to 25 mg.  Id.  Nurse Practioner Leonard also ordered blood work to check plaintiff's potassium levels.  Dkt. No. 47-11 at ¶ 58.  The blood work included a basic metabolic panel and a blood glucose test.  Dkt. No. 47-13 at ¶ 36.

On May 26, 2016, plaintiff went to Samaritan Hospital for an EKG and nuclear stress test.  Dkt. No. 47-9 at 124.  Plaintiff's EKG suggested mild concentric left ventricular hypertrophy, a thickening of the heart's muscle wall.  Dkt. No. 47-9 at 124; Dkt. No. 47-11 at ¶ 60.  The results of the EKG, blood pressure response, and isotope distribution were otherwise normal.  Dkt. No. 47-11 at ¶ 61.  On or about May 27, 2016, plaintiff complained of deteriorating vision.  Dkt. No. 47-9 at 129.  RCJ staff put plaintiff on the list for the eye doctor.  Id.

On June 1, 2016, Dr. Fricke saw plaintiff again.  Dkt. No. 47-9 at 132.  Plaintiff complained of blurry vision and trouble breathing.  Id.  Plaintiff believed his HCTZ medication caused his blurred vision.  Id.  Dr. Fricke assessed plaintiff's respirations with a peak flow meter.  Id.  Dr. Fricke also tested plaintiff's vision using a Rosenbaum Pocket Vision Card and referred plaintiff to an optometrist.  Id. at 132-33.  Dr. Fricke offered a substitute for HCTZ, which plaintiff refused.  Id. at 132.  Dr. Fricke lowered plaintiff's dose of HCTZ to its original level of 12.5 mg. a day and ordered continued blood pressure checks.  Id.

On June 2, 2016, plaintiff met with nonparty Nurse Heather Holliday.  Dkt. No. 47-9 at 138-40.  Plaintiff complained of an inability to see, constipation, headaches, and

an inability to drink water due to its metallic taste. <u>Id.</u> at 138. Nurse Holliday prescribed

Motrin and Aspirin and advised plaintiff to ambulate and drink fluids. <u>Id.</u> at 140.

At approximately 9:00 A.M. on June 3, 2016, Nurse Holliday saw plaintiff in his

cell. Dkt. No. 47-9 at 141. Plaintiff said he could not see and was dizzy. <u>Id.</u> Plaintiff

also complained of dry mouth, weight loss, and an inability to eat. <u>Id.</u> Nurse Holliday

tested plaintiff's blood glucose. <u>Id.</u> Plaintiff's blood glucose level was 528. <u>Id.</u> Dr.

Fricke ordered 12 units of Humalog, a fast-acting insulin, and emergency transportation

to the hospital. <u>Id.</u> at 147.

At approximately 10:00 A.M. on June 3, 2016, plaintiff was admitted into

Samaritan Hospital. Dkt. No. 1-1 at 21. Plaintiff received insulin and intravenous fluids.

Dkt. No. 47-9 at 157. Samaritan medical staff diagnosed plaintiff with diabetes. <u>Id.</u> On

June 6, 2016, Samaritan doctors discovered a small bowel obstruction during an

abdominal X-ray. <u>Id.</u> at 167. On June 9, 2016, nonparty Dr. Christina Sanders removed

the obstruction and a portion of plaintiff's small bowel. <u>Id.</u> at 171, 173, 174. Dr.

Sanders also lysed adhesions between the loops of plaintiff's small bowel and anterior

abdominal wall. <u>Id.</u> at 174. On June 20, 2016, Samaritan Hospital discharged plaintiff.

<u>Id.</u> at 192.

### B. Plaintiff's Recitation of Facts

Plaintiff contends that he had medical issues throughout his detention at RCJ.

Dkt. No. 1 at 11. Plaintiff argues that Dr. Fricke was aware of plaintiff's complications

two months before his "organ failure." <u>Id.</u> at 9. During his March 16, 2016, appointment

Dr. Fricke gave plaintiff a breathing exam. Dkt. No. 47-8 at 41. During the exam, Dr.

Fricke told him, "he can get a 4-foot, 11 girl to blow into the apparatus harder than I

could." Id. at 42.  At that exam, and at other times, Dr. Fricke accused plaintiff of

malingering.  Dkt. No. 1 at 9.  Plaintiff contends that Dr. Fricke should have known of

plaintiff's diabetes from his symptoms or from the BioReference Laboratories report and

taken action before plaintiff's "organs failed."  Dkt. No. 1 at 8; Dkt. No. 61 at 4.

Plaintiff argues that Dr. Fricke's failure to provide adequate care led to a delay in

plaintiff's diabetes diagnosis and his hospitalization.  Dkt. No. 1-1 at 32.  Plaintiff

contends that Dr. Fricke's acts or omissions led him to experience "organ failure," loss

of vision, a small bowel obstruction that required surgery, and "probable morbidity."  Dkt.

No. 1-1 at 7, 32; Dkt. No. 61 at ¶ 71.  Plaintiff contends that, before his incarceration, he

did not have vision problems, high blood pressure, or diabetes.  Dkt. No. 1 at 9.  Plaintiff

further contends that his bowel obstruction developed during his incarceration at RCJ.

Dkt. No. 61 at ¶ 71.

## C. Defendants' Recitation of Facts

In support of his motion, Dr. Fricke filed a Statement of Material Facts.[5]  Dkt. No.

47-13.  Dr. Fricke saw plaintiff two times before plaintiff's hospitalization on June 3,

---

[5] N.D.N.Y. Local Rule 7.1 (a)(3) states:

> Summary Judgment Motions
>
> Any motion for summary judgment shall contain a Statement of Material Facts.  The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue.  Each fact listed shall set forth a specific citation to the record where the fact is established.  The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.
>
> The opposing party shall file a response to the Statement of Material Facts.  The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs.  Each denial shall set forth a specific citation to the record where the factual issue arises.  The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute.  Any facts set forth in the

2016.  Dkt. No. 47-13 at ¶ 11.  On May 18, 2016, Nurse Practiner Leonard ordered

blood work.  Id. at ¶ 34.  She did not order blood work to test for diabetes.  Id. at ¶ 35.

The blood work was sent to BioReference Laboratories.  Id. at ¶ 36.  BioReference

Laboratories did not call RCJ to report plaintiff's elevated blood glucose levels.  Id. at ¶

38.  It was "standard procedure" for laboratories to call RCJ "to report critical values

such as elevated blood glucose levels."  Id. at ¶ 39.  Further, BioReference Laboratories

did not fax or mail the lab report to RCJ although it was also "standard procedure" for

outside laboratories to fax and mail lab reports to RCJ.  Id. at ¶¶ 40, 41.

On June 1, 2016, Dr. Fricke saw plaintiff for the second time.  Dkt. No. 47-13 at ¶

47.  Dr. Fricke was unaware of plaintiff's blood work results at this time.  Id. at ¶ 49.

Plaintiff did not cooperate with a peak-flow meter test.  Id. at ¶ 58.  Dr. Fricke also tested

plaintiff's eyesight, which had improved since his initial eye test in 2015.  Dkt. No. 47-11

at ¶ 74.  During this visit, plaintiff did not complain about increased urination, intense

thirst, the urge to drink increasing amounts of water, nausea, vomiting, abdominal pain,

weight loss, or lethargy, which are symptoms of uncontrolled hyperglycemia or

emerging diabetes.  Dkt. No. 47-13 at ¶¶ 50-53.  On June 5, 2016, Samaritan Hospital

discovered a bowel obstruction which developed at Samaritan Hospital.  Id. at ¶ 71.

## II.  DISCUSSION[6]

---

Statement of Material Facts shall be deemed admitted unless specifically
controverted by the opposing party.

[6] All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have
been provided to plaintiff.

Plaintiff alleges that Dr. Fricke was deliberately indifferent to his serious medical needs in violation of the Due Process Clause of the Fourteenth Amendment.  See generally Dkt. No. 1.  Dr. Fricke argues that plaintiff cannot demonstrate deliberate indifference because the record demonstrates that he was not subjectively reckless.  See Dkt. No. 47-14.

## A. Legal Standards

### 1. Summary Judgment standard

"A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The moving party has the burden of showing the basis for its motion.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party satisfies this burden by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'" that show an absence of a genuine issue of material fact.  Id.  There is a genuine issue of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party."  Skuble v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

A non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (internal quotation marks omitted).  Instead, a

non-moving party must support his or her assertions with evidence showing a genuine issue of material fact.  See id. at 586.  Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.'" Smith v. Woods, 9:03-CV-480 (DNH), 2006 WL 1133247, at *3 & n.11 (N.D.N.Y. Apr. 24, 2006) (quoting Jeffreys v. City of New York, 426 F.3d 549, 554-55 (2d Cir. 2005)) (additional citations omitted).  "When no rational jury could find in favor of the non-moving party because the evidence to support is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper."  Gallo v. Prudential Services, Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

In determining summary judgment, "[f]actual disputes that are irrelevant or unnecessary will not be counted."  Liberty Lobby, 477 U.S. at 247.  The nonmovant "must present affirmative evidence in order to defeat a properly supported motion for summary judgment."  Id. at 257.  "Mere conclusory statements or reliance on the pleadings, . . . will not suffice, . . . ."  Celotex, 477 U.S. at 324.  The court must look to the substantive law to identify which facts are material.  Liberty Lobby, 477 U.S. at 248.

When, as here, a party seeks judgment against a pro se litigant, a court must afford a non-movant special solicitude.  See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006).  The Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is
> entitled to "special solicitude," . . . that a pro se litigant's submissions must
> be construed "liberally," . . . and that such submissions must be read to
> raise the strongest arguments that they "suggest," . . . .  At the same time,

> our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, . . . or arguments that the submissions themselves do not "suggest," . . . that we should not "excuse frivolous or vexatious filings by pro se litigants," . . . and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law . . .

Triestman, 470 F.3d at 477 (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

## 2. Deliberate Indifference standard

As plaintiff is a pretrial detainee his deliberate indifference claim falls under the Due Process Clause of the Fourteenth Amendment.  Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2007) (quoting inter alia Iqbal v. Hasty, 490 F.3d 143, 168 (2d Cir. 2007) ("Pretrial detainees have not been convicted of a crime and thus 'may not be punished in any manner-neither cruelly and unusually nor otherwise.'")).  Until recently, the Second Circuit instructed that "[c]laims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment.'"  V.W. ex rel. Williams v. Conway, 236 F. Supp. 3d 554, 582-83 (N.D.N.Y. 2017) (quoting Caiozzo v. Koreman, 581 F.3d 63, 72 (2d Cir. 2009)).  However, in 2017 the Darnell Court extended the Supreme Court's decision in Kingsley v. Hendrickson, _ U.S. _ ,135 S. Ct. 2466, 2470 (2015) to allegations related to unconstitutional conditions of confinement.[7]  See Darnell, 849 F.3d at 35.  The Darnell

---

[7] The Kingsley Court held that a pretrial detainee bringing an excessive force claim under the Fourteenth Amendment ""must show only that the force purposely or knowingly used against him was objectively unreasonable."  135 S. Ct. at 2470.

Court reasoned, "[u]nlike a violation of the Cruel and Unusual Punishments Clause [of the Eighth Amendment], an official can violate the Due Process Clause of the Fourteenth Amendment without meting out any punishment, which means that the Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." Id.

Although Darnell involved a challenge to conditions of confinement, district courts within this Circuit have applied Kingsley to all pretrial detainees' deliberate indifference claims. See, e.g., Villafane v. Sposato, No. 16-CV-3674, 2017 WL 4179855, at *19 (E.D.N.Y. Aug. 22, 2017) ("District Courts in this circuit have applied Kingsley to claims for deliberate indifference to medical needs"); Lloyd v. City of New York, 246 F. Supp. 3d 704, 718 (S.D.N.Y. 2017) ("The reasoning of Darnell applies equally to claims of deliberate indifference to serious medical needs under the Fourteenth Amendment."); Feliciano v. C.O. Anderson, No. 15-CV-4106 (LTS)(JLC), 2017 WL 1189747, at *13 (S.D.N.Y. Mar. 30, 2017) ("Applying Darnell to claims of deliberate indifference to serious medical needs, the Court concludes that a defendant possesses the requisite mens rea when he acts or fails to act under circumstances in which he knew, or should have known, that a substantial risk of serious harm to the pretrial detainee would result.") (collecting cases).

To establish a claim for deliberate indifference under the Due Process Clause, a plaintiff must satisfy a two-prong test. Darnell, 849 F.3d at 29. First, the deprivation must have been "sufficiently serious." Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006) (citation and internal quotation marks omitted). Second, the defendant must have

acted or failed to act with "a sufficiently culpable state of mind," which, "in prison conditions cases," is "deliberate indifference to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 834 (1994).

### a. First Prong standard

Under the Fourteenth Amendment, deliberate indifference is measured from an objective perspective.[8] Darnell, 849 F.3d at 35.[9] The objective prong is satisfied "when (a) the prisoner was actually 'deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.'" Bellotto v. Cty. of Orange, 248 F. App'x 232, 236 (2d Cir. 2007) (summary order) (quoting Salahuddin, 467 F.3d at 279-80).

To determine whether an alleged deprivation of medical care is "sufficiently serious" -- the first prong of the deliberate indifference analysis -- a court is required to, (1) determine whether the medical care was inadequate, and, (2) if so, "to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." Salahuddin, 467 F.3d at 279-80 (citing Helling v. McKinney, 509 U.S. 25, 32-33 (1993)). However, "[n]ot every lapse in medical care is a constitutional wrong." Salahuddin, 467 F.3d at 279.

In assessing the adequacy of care -- the first inquiry in assessing whether a deprivation of care was sufficiently serious -- "the prison official's duty is only to provide

---

[8] Although the second prong of the deliberate indifference analysis differs from Eighth Amendment cases, the first prong remains the same. See Padilla v. Corr. Care Solutions, No. 9:17-CV-1150 (MAD/TWD), 2018 WL 550610, at *3 (N.D.N.Y. Jan. 22, 2018).

[9] In Darnell, the Second Circuit clarified that the second element of a deliberate indifference claim, though characterized as "subjective," is better understood as an element analyzing "*mens rea*" because it is "defined objectively." Darnell, 849 F.3d at 29, 35.

reasonable medical care." Salahuddin, 467 F.3d at 279-80 (citing Farmer, 511 U.S. at 845). "Thus, prison officials who act reasonably [in response to an inmate-health risk] cannot be found liable . . . and, conversely, failing to take reasonable measures in response to a medical condition can lead to liability." Id. at 279 (internal quotation marks and citations omitted; brackets in original.). The second inquiry in assessing whether a plaintiff's deprivation of care was sufficiently serious varies according to the plaintiff's allegations. See Smith v. Carpenter, 316 F.3d 178, 185 (2d Cir. 2003). "[I]f the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." Salahuddin, 467 F.3d at 280.[10] If, however, the plaintiff alleges that medical treatment was received but it was inadequate, the inquiry is narrower, and the court should focus on the specific inadequacy of the treatment, not the underlying medical condition alone. Id. (citing Smith, 316 F.3d at 186).

Finally, where a delay in medical treatment is alleged, "it is appropriate to focus on the challenged delay or interruption in treatment rather than the [detainee's] underlying medical condition alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious . . . .'" Smith, 316 F.3d at 185 (quoting Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)); see also Salahuddin, 467 F.3d at 280. A delay in medical treatment must be interpreted in the "context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay." See id. at 186 (citing Chance, 143 F.3d at 702) ("[I]f prison officials

---

[10] "There is no need to distinguish between a prisoner's underlying 'serious medical condition' and the circumstances of his 'serious medical need' when the prisoner alleges that prison officials have failed to provide general treatment for his medical condition." Smith, 316 F.3d at 185-86.

deliberately ignore the fact that a prisoner has a five-inch gash on his cheek that is becoming infected, the failure to provide appropriate treatment might well violate the Eighth Amendment.").

### b. Second Prong standard

For a plaintiff to satisfy the second prong, concerning *mens rea*, the defendant must have behaved in an objectively reckless manner, or "knew, or should have known, that the condition posed an excessive risk to health or safety." Darnell, 849 F.3d at 35. "Although *mens rea* is assessed from an objective perspective, as opposed to the more demanding subjective recklessness standard employed in the Eighth Amendment context, negligence is still insufficient to give rise to a valid claim under the Fourteenth Amendment." Smith v. Outlaw, No. 15-CV-9961 (RA), 2017 WL 4417699, at *3 (S.D.N.Y. Sept. 30, 2017) (citing Darnell, 849 F.3d at 36); see also Kingsley, 135 S.Ct. at 2472 ("[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.").

### B. Analysis

Plaintiff claims that Dr. Fricke was deliberately indifferent to plaintiff's serious medical needs. Dkt. No. 1 at 4. He alleges that Dr. Fricke was "aware of plaintiff's complications two months before plaintiff's organs failed," but failed to diagnose and treat the underlying problem. Id. at 9. Plaintiff contends that, as a result of Dr. Fricke's failings, he now suffers irreversible injury. Id. Plaintiff has high blood pressure, diabetes, and wears eyeglasses. Id. Plaintiff takes Lisinopril, Atorvastatin, HCTZ, and Metformin for these conditions. Id. at 10. Plaintiff suggests that Dr. Fricke's deliberate

indifference to his medical needs resulted in a delay in the diagnosis and treatment of

plaintiff's diabetes and his subsequent hospitalization, bowel surgery, and decreased

lifespan. Id. at 9. Additionally, plaintiff suggests that Dr. Fricke's deliberate indifference

to his medical needs caused or contributed to the development of his high blood

pressure and vision troubles. Id. Viewing the facts and drawing all reasonable

inferences in plaintiff's favor, for the reasons that follow, the Court concludes that no

reasonable factfinder could find that Dr. Fricke was deliberately indifferent to plaintiff's

serious medical needs.

### 1. First Prong: Objective Component

Plaintiff alleges both inadequate medical care and a delay in treatment. See

generally Dkt. No. 1. However, plaintiff fails to show how Dr. Fricke's care was

inadequate under the circumstances and what harm the alleged inadequacy caused him

or will likely cause him. See infra at 17-26. Additionally, plaintiff fails to show how Dr.

Fricke's alleged delay in treatment was unreasonable and how the alleged delay

worsened plaintiff's medical conditions. Id.

### a. Adequacy of Care

As to the first inquiry of the objective component, adequacy of care, no reasonable

juror could find that plaintiff was actually deprived of adequate medical care.

Salahuddin, 467 F.3d at 279-80. Dr. Fricke and nonparty RCJ staff closely monitored

plaintiff's medical conditions and complaints. See generally Dkt. No. 47-9. Plaintiff saw

RCJ medical staff over fifty-six times between September 27, 2015, and his

hospitalization on June 3, 2016. Id. at 29-144. Plaintiff received a nuclear stress test,

an EKG, a physical, an eye exam, a sputum culture test, a complete blood count, a

breath exam, a chest X-ray, blood pressure medication, rash medication, and over thirty-one blood pressure checks during this period.  Id.

Plaintiff points to the BioReference Laboratories report ordered on May 18, 2016, as evidence of Dr. Fricke's deliberate indifference and inadequate care.  Dkt. No. 52 at 8-9.  Plaintiff claims that this report was available to Dr. Fricke on the BioReference Laboratories website on May 21, 2016, suggesting that Dr. Fricke had received the report at that time or had the ability to access the results.  Id. at 4.  However, based on Dr. Fricke's affidavit, BioReference Laboratories never sent this report to the jail or called to alert him of plaintiff's elevated blood glucose levels, which is their standard procedure.  Dkt. No. 47-11 at ¶ 97.  Further, other record evidence supports Dr. Fricke's assertions.  On the May 21, 2016, lab report in the record, there is a handwritten note stating, "June 3- pulled from website" with Nurse Holliday's signature.  Dkt. No. 47-9 at 121.  This copy of the report does not have a "time received" fax stamp.  Id.  However, BioReference Laboratories did fax plaintiff's prior gram culture and sputum results.  Id. at 74.  The gram culture and sputum test results do have a "time received" fax stamp.  Id.  Although not dispositive, the absence of a time received fax stamp on plaintiff's May 21, 2016, report suggests that BioReference Laboratories did not fax the May 21, 2016, to the jail.  Plaintiff has presented no evidence or non-conclusory argument to the contrary.  See Dkt. Nos. 1, 22, 52, 61.

Plaintiff also alleges that even if BioReference Laboratories failed to fax or mail the May 21, 2016, bloodwork report to RCJ, Dr. Fricke had access to the BioReference Laboratories website where the results were available, and, therefore, Dr. Fricke should have obtained the results sooner than June 3, 2016.  Dkt. No. 52 at 4.  Plaintiff appears

to argue that if Dr. Fricke had obtained the blood results sooner, he would not have suffered negative medical consequences, or they would have been less severe. Id. at 4-5. Even if the lab had faxed or otherwise sent the report to RCJ, plaintiff has failed to demonstrate inadequacy of care because he does not demonstrate that Dr. Fricke was aware, or should have been aware, of plaintiff's elevated glucose levels.

As indicated above, when evaluating adequacy of care, the court examines if an individual providing care to a detainee acted unreasonably under the circumstances. Salahuddin, 467 F.3d at 279-80 (citing Farmer, 511 U.S. at 845). Dr. Fricke was not unreasonable in failing to seek out plaintiff's blood results before June 3, 2016. First, plaintiff admits that he did not have a history of diabetes before his incarceration at RCJ. Dkt. No. 1 at 11. Second, before June 3, 2016, plaintiff did not present with telltale signs of diabetes at either of his visits with Dr. Fricke. Dkt. No. 47-9 at 71, 132. Dr. Fricke addressed and treated the medical symptoms with which plaintiff did present. Plaintiff complained of cold-like symptoms on March 16, 2016. Id. at 84. Dr. Fricke suspected that plaintiff had a "viral illness in convalescent phase" and tested for a bacterial infection. Dkt. No. 47-11 at ¶¶ 38, 39. When the tests were negative, Dr. Fricke prescribed three days of symptomatic treatment. Id. at ¶ 42. When plaintiff complained of chest pain on April 16, 2016, Dr. Fricke had plaintiff tested by a cardiologist on May 9, 2016. Dkt. No. 47-9 at 86, 113. When plaintiff complained of vision trouble on June 1, 2016, Dr. Fricke tested his vision and referred him to an optometrist. Id. at 129. During these visits, Dr. Fricke listened to plaintiff's complaints and treated them in accordance with his medical judgment. Dr. Fricke did not test for diabetes or seek out the May 21, 2016, bloodwork results because plaintiff's symptoms

and history did not indicate that plaintiff was suffering from diabetes.  Although not

dispositive, nonparty medical professional Dr. Toll concluded that "[t]reatment

recommendations by Dr. Fricke were appropriate at both visits."[11]  Dkt. No. 47-12 at ¶

28.  Dr. Toll further opined that "Dr. Fricke evaluated all of [plaintiff's] presenting

complaints, especially the visual and respiratory complaints, preformed appropriate

physical examinations and reviewed all <u>available</u> testing data."  Id. (emphasis in

original).

For the reasons stated, plaintiff fails to demonstrate how Dr. Fricke was

unreasonable, as defined by the deliberate indifference standards, in not discovering

the May 21, 2016, lab report at an earlier date.  It is important to note that,

> Disagreement with prescribed treatment does <u>not</u> rise to the level of a
> constitutional claim.  <u>Sonds</u>,151 F. Supp. 2d at 311.  Prison officials have
> broad discretion in determining the nature and character of medical treatment
> afforded to inmates.  <u>Id.</u> (citations omitted).  An inmate does <u>not</u> have the
> right to treatment of his choice.  <u>Dean v. Coughlin</u>, 804 F.2d 207, 215 (2d Cir.
> 1986).  The fact that plaintiff might have preferred an alternative treatment or
> believes that he did not get the medical attention he desired does not rise to
> the level of a constitutional violation.  <u>Id.</u>  Thus, disagreements over
> medications, diagnostic techniques, forms of treatment, the need for
> specialists, and the timing of their intervention implicate medical judgments
> and not the Eighth Amendment.  <u>Sonds</u>, 151 F. Supp. 2d at 312 (citing
> <u>Estelle v. Gamble</u>, 429 U.S. at 107).

<u>Allen v. Cooley</u>, No.9:04CV91, 2006 WL 2376927, at *3 (N.D.N.Y. Aug. 16, 2006).

There is ample evidence of plaintiff receiving medical care following each complaint

he made to Dr. Fricke.  "[P]rison officials may not be held liable . . . if they responded

reasonably to a known risk, even if the harm ultimately was not averted."  <u>Farmer</u>, 511

---

[11] Dr. Toll is a board-licensed doctor who practiced internal medicine from 1979 to 2016 in the capital region of New York State.  Dkt. No. 47-12 at ¶ 1.  Dr. Toll reviewed plaintiff's medical records, complaint, response to interrogatories, and deposition transcript, along with defendant's answer before submitting his medical opinion regarding Dr. Fricke's medical care of plaintiff.  <u>Id.</u> at ¶ 4.

U.S. at 826. Insofar as plaintiff disagrees with Dr. Fricke's treatment of his symptoms or conditions or his method for checking on results from outside labs, because Dr. Fricke's conduct was reasonable under the circumstances, plaintiff fails to demonstrate a deprivation of adequate medical care.  See Farmer, 511 U.S. at 847; see also Salahuddin, 467 F.3d at 279.  For reasons stated, plaintiff fails the first inquiry of the objective prong.

### b. Sufficiently Serious

Even if, *arguendo*, plaintiff had demonstrated a denial of adequate medical care, plaintiff has failed to show that the denial was "sufficiently serious."  Salahuddin, 467 F.3d at 279-80.  Insofar as plaintiff argues that the care he received was inadequate, plaintiff fails to show how "the offending conduct was inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner."  Id. at 280.  To the extent plaintiff argues that a delay in diagnosis or treatment caused him injury, plaintiff fails to show how "the alleged delay in treatment worsened plaintiff's medical conditions." Carpenter, 316 F.3d at 185 (quoting Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)); see also Salahuddin, 467 F.3d at 280.

Plaintiff seems to allege that Dr. Fricke's inadequate medical care and subsequent delay in treatment led to his development of diabetes, high blood pressure, vision problems, a bowel obstruction necessitating surgery, and "probable morbidity." Dkt. No. 1 at 4.  These allegations fail for the following reasons.

### i. Diabetes

The onset of diabetes can be "a sufficiently serious medical condition" to meet the threshold of a serious medical need.  Beatty v. Davidson, 713 F. Supp. 2d 167, 174

(W.D.N.Y. 2010).  "A serious medical need is generally characterized by 'a condition of urgency, one that may produce death, degeneration, or extreme pain.'"  Edmonds v. Central N.Y. Psychiatric Ctr., No. 10: Civ. 5810 (DAB)(KNF), 2011 WL 3809913, at *4 (S.D.N.Y. Aug. 25, 2011) (quoting Johnson v. Wright, 412 F.3d 398, 403 (2d Cir. 2005) (citation omitted)).  However, when looking at deprivation of care, "[i]t's the particular risk of harm faced by the prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for [constitutional] purposes."  Carpenter, 316 F.3d at 186.  Further, when a plaintiff alleges a delay in treatment, the court considers the "context of the seriousness of the medical need . . . whether the delay worsened the medical condition . . . and the reason for delay."  See Salahuddin, 467 F.3d at 186 (citing Chance, 143 F.3d at 702).

   Plaintiff's claims rest on Dr. Fricke's failure to diagnose him with diabetes before his hospitalization on June 3, 2016.  Dkt. No. 1 at 4, 8.  As discussed, plaintiff did not present with the usual signs of diabetes at either visit with Dr. Fricke.  Dkt. No. 47-9 at 71, 132.  Plaintiff argues he satisfies the objective prong of the deliberate indifference analysis because doctors discovered his diabetes while he was incarcerated.  See Dkt. No. 52 at 6.  To support this position plaintiff cites to Edmonds.  Id.  In Edmonds, the Court does recognize the onset of diabetes as a sufficiently serious medical condition to meet the threshold of serious medical need; however, Edmonds is factually distinguishable.  2011 WL 3809913, at *5.  In Edmonds, the plaintiff was tested for diabetes numerous times because it was a side effect of her prescribed medication.  Id. Tests revealed that the plaintiff had diabetes, but doctors neglected to tell her of her

diagnosis and did not treat her condition for five months.  Id.  Here, plaintiff was not

specifically tested for diabetes because he did not display the usual diabetic symptoms

and had no history of diabetes.  Dkt. No. 47-9 at 71, 132.  Once plaintiff exhibited these

symptoms, he was tested and hospitalized.  Id. at 141.  There was a two-week period

between BioReference Laboratories' uploading of the test results online and plaintiff's

hospitalization.  Id. at 121-141.  However, plaintiff continued to see medical staff during

this period and actively received treatment.  Id.  Although there is a two-week delay

between the "availability" of plaintiff's lab work and his hospitalization, unlike in

Edmonds, where the doctors were aware of the plaintiff's diagnosis, Dr. Fricke was

unaware that plaintiff had diabetes during this two-week period.  2011 WL 3809913, at

*5.  Further, although plaintiff may have preferred Dr. Fricke to diagnose his diabetes

sooner, Dr. Fricke still provided him with reasonable care insofar as he responded to all

of plaintiff's complaints and referred him to other medical professionals.  see Thomas v.

Wright, No. 99-CV-2071, 2002 WL 31309190, at *8-9 (N.D.N.Y. Oct. 11, 2002) (holding

that, "[a]lthough the[ defendants] may have failed to diagnose or even detect his

cancer," the defendants did not act with "deliberate indifference" because they "ordered

medical tests, prescribed courses of treatments, and monitored his laboratory and

radiological reports").

    When looking at a delay in treatment, the court focuses on the deprivation of care,

rather than seriousness of medical need.  Carpenter, 316 F.3d at 186.  Plaintiff's delay

in treatment was minimal and not a result of Dr. Fricke's inadequate care.  To the extent

that plaintiff argues that Dr. Fricke should have discovered plaintiff's diabetes earlier

than June 3, 2016, even if BioReference Laboratories did not notify him of the results,

as discussed, plaintiff did not present with signs of diabetes at either visit with Dr.

Fricke.  Dkt. No. 47-9 at 71, 132.  Dr. Fricke did not discover plaintiff's diabetes before

June 3, 2016, because of a lack of typical diabetic symptoms, which does not amount to

a lack of adequate care.

In addition to the delay in treatment of his diabetes, plaintiff also seems to allege that

Dr. Fricke's treatment, or lack of treatment, led to his development of diabetes.  Dkt. No.

1 at 4.  Plaintiff cites no evidence to support this claim, nor is there any support in his

medical record; thus, plaintiff failed to show how any of Dr. Fricke's acts or omissions

caused him to develop diabetes.  See Dkt. Nos. 1, 22, 47-9, 52, 61; See also Celotex,

447 U.S. at 324 (requiring "the nonmoving party to go beyond the pleadings" to defeat

summary judgment).  Accordingly, plaintiff has failed to show that Dr. Fricke provided

inadequate care with respect to his diabetes or that such inadequacy was sufficiently

serious.

### ii. High Blood Pressure

Plaintiff seems to allege that Dr. Fricke's inadequate medical care led to his

development of high blood pressure, arguing that he did not have high blood pressure

before his incarceration at RCJ.  Dkt. No. 1 at 9.  Nurse Practioner Claudia Graham

diagnosed plaintiff with high blood pressure on February 9, 2016.  Dkt. No. 47-9 at 52.

Plaintiff's diagnosis took place over one month before his first visit with Dr. Fricke on

March 16, 2016.  Id. at 71.  After plaintiff's diagnosis, he was prescribed HCTZ for his

high blood pressure.  Dkt. No. 47-13 at ¶ 13.  Plaintiff's high blood pressure was also

monitored throughout his detention at RCJ.  See generally Dkt. No. 47-9.  Plaintiff's

blood pressure was checked over thirty-four times between his diagnosis and

hospitalization on June 3, 2016.  Id. at 29-144.  Although plaintiff contends that he "did

not suffer from high blood pressure before his incarceration," plaintiff cites no evidence

to support his claims that his blood pressure developed or worsened because of Dr.

Fricke's treatment or lack of treatment.  See Dkt. Nos. 1, 22, 52, 61.  Additionally,

plaintiff's May 26, 2016, EKG showed "mild concentric left ventricular hypertrophy."  Dkt.

No. 47-9 at 124.  According to Dr. Toll, hypertrophy of this nature "was likely caused by

high blood pressure" and "not of recent origin."  Dkt. No. 47-12 at ¶ 18.  Dr. Fricke also

submitted his medical opinion that plaintiff's left ventricular hypertrophy "is associated

with chronic high blood pressure."  Dkt. No. 47-11 at ¶ 60.  Accordingly, plaintiff has

failed to show how Dr. Fricke's conduct surrounding his high blood pressure was

inadequate and caused, or will likely cause, plaintiff harm in the future.  Salahuddin, 467

F.3d at 280.

### iii. Vision

Plaintiff claims that he did not wear prescription eyeglasses before his incarceration

and arguably suggests that Dr. Fricke's unspecified acts or omissions are responsible

for his declining vision.  Dkt. No. 1 at 4.  However, the record shows that plaintiff had

eyeglasses upon his admission to RCJ.  Dkt. No. 47-9 at 22.  The record further

demonstrates that plaintiff's vision stayed roughly the same throughout his detention at

RCJ, as evidenced by his two eye exams.  Id. at 22, 132.  Additionally, upon plaintiff's

complaint of blurry vision, on May 27, 2016, Dr. Fricke referred plaintiff to an

optometrist.  Id. at 129.  Therefore, plaintiff has failed to show how Dr. Fricke's conduct

surrounding his vision was inadequate or caused him any harm.  Salahuddin, 467 F. 3d

at 280.

### iv. Bowel Obstruction

Plaintiff cites his June 9, 2016, laparotomy (Dkt. No. 47-9 at 187) and bowel surgery as further evidence of Dr. Fricke's inadequate care and resultant harm.  Dkt. No. 52 at 6.  However, RCJ staff and Samaritan doctors note that plaintiff had bowel sounds present before hospitalization (Dkt. No. 47-11 at ¶ 88) and upon entering Samaritan Hospital.  Dkt. No. 47-9 at 157.  It was not until June 5, 2016, that nonparty Dr. Sanders noticed increased distention in plaintiff's bowel.  Id. at 165.  On June 6, 2016, doctors discovered the bowel obstruction during an abdominal X-ray.  Id. at 167.  On June 9, 2016, plaintiff underwent surgery to remove the previously-discovered obstruction and lyse extensive adhesions around his bowels.  Id. at 171-74.  Upon discharge, Samaritan doctors noted that plaintiff's bowel blockage was resolved.  Id. at 187.  Although plaintiff claims that Dr. Fricke's acts or omissions led to plaintiff's bowel problems, even if plaintiff had been able to demonstrate that his bowel obstruction developed while he was incarcerated at RCJ, there is no medical evidence to support a claim that Dr. Fricke's acts or omissions were responsible for plaintiff's bowel issues.  Id. at 171.  Accordingly, plaintiff has failed to show how Dr. Fricke's conduct surrounding his bowel problems was inadequate or caused any resultant harm.  Salahuddin, 467 F. 3d at 280.

### v. "Probable Morbidity" and "Organ Failure"

Plaintiff also alleges, in a wholly conclusory fashion, that his "organs failed" and now he has "probable morbidity" as a result of Dr. Fricke's care.  Dkt. No. 1 at 4.  Liberally construed, it appears that plaintiff is claiming that his medical condition worsened, leading to "organ failure" and risk of death, as a result of Dr. Fricke's alleged failure to identify and treat his diabetes.  See id.  It is unclear what plaintiff means by "organ

failure"; however, Dr. Fricke submitted an uncontroverted medical opinion demonstrating that plaintiff's "acute renal failure" came from "loss of blood to plaintiff's kidneys" that is "entirely reversible when normal blood volume and glucose levels are restored." Dkt. No. 47-11 at ¶ 87. Plaintiff presents no evidence that the bowel obstruction occurred due to Dr. Fricke's acts or omissions. Upon discharge from the hospital, Samaritan doctors noted that plaintiff's renal failure was resolved. Dkt. No. 47-9 at 187. Although plaintiff uses the phrase "probable morbidity," at no point in the record does any medical professional conclude that plaintiff's life expectancy is lessened as a result of Dr. Fricke's alleged delay in diagnosing plaintiff's diabetes. See generally Dkt. No. 47-9. For the reasons stated, plaintiff has failed to show how Dr. Fricke's conduct was inadequate and what harm the inadequacy caused, or will likely cause, plaintiff in the future. Salahuddin, 467 F.3d at 280.

Based on the foregoing, the undersigned finds that there exists no material issue of fact as to whether plaintiff "was actually deprived of adequate medical care" as it relates to his diabetes, high blood pressure, vision, bowel obstruction and resultant surgery, and life expectancy. Plaintiff does not satisfy the requirements of the first prong in Darnell. See id. at 29 (establishing that deliberate indifference under the Fourteenth Amendment is the same as under the Eighth Amendment and therefore a pretrial detainee must satisfy two prongs to prove a claim of deliberate indifference, the objective prong and the subjective prong); Dobbins v. Ponte, No. 15-CV-3091 (JMF), 2017 WL 3309726, at *6 (S.D.N.Y. Aug. 2, 2017) (granting summary judgment to prison official where undisputed facts showed that the pretrial detainee received adequate medical treatment); Gray v. Kang Lee, No. 9:13-cv-258 (GLS/DEP), 2015 WL 1724573,

at *4 (N.D.N.Y. Apr. 15, 2015) (finding that the plaintiff was not deprived of adequate medical treatment where the record demonstrated that the inmate was frequently treated, prescribed pain medication, given an X-ray and an MRI, and referred to an orthopedic specialist).

## 2. Second Prong: Subjective Component

Even assuming, *arguendo*, that plaintiff demonstrated that he was actually deprived of adequate medical care, plaintiff cannot satisfy the second prong of the analysis, the *mens rea* prong. Darnell, 849 F.3d at 35. To satisfy the *mens rea* prong, a plaintiff must prove that the defendant "knew, or should have known, the condition posed an excessive health risk to health or safety." Id. In other words,

> The pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety.

Id.

Plaintiff fails to demonstrate how Dr. Fricke "acted intentionally to impose the alleged condition or recklessly failed to act with reasonable care." Darnell, 849 F.3d at 35. Plaintiff claims that Dr. Fricke "knew of or should have known" of his diabetes because Dr. Fricke "received" the May 21, 2016, BioReference Laboratories report showing his elevated blood glucose levels. Dkt. No. 62 at 4. Plaintiff also claims that Dr. Fricke should have known of his diabetes because his "pain and symptoms grew more severe." Dkt. No. 1 at 4.

As discussed, although it was standard procedure for BioReference Laboratories to mail and fax lab results, the record suggests these results were not sent to RCJ. Dkt. No. 47-9 at 121; Dkt. No. 47-11 at ¶ 97; Dkt. No. 47-9 at 74. The nurses at RCJ "check the fax machine and review the reports for any results that are unusual or require immediate attention." Dkt. No. 47-11 at ¶ 14. Plaintiff's previous lab reports were faxed and received by nurse practioners. Dkt. No. 47-9 at 74-76. Additionally, Dr. Fricke stated, "it was standard procedure for outside laboratories to call the jail to report any critical values such as an elevated blood glucose" and "[n]o one at the jail had alerted me about the lab report." Dkt. No. 47-11 at ¶¶ 97, 98. Although plaintiff may disagree over the way nonparty RCJ staff and Dr. Fricke obtain lab reports and his report specifically, plaintiff's disagreement is not enough to show that Dr. Fricke "acted intentionally to impose the alleged condition or recklessly failed to act with reasonable care." Darnell, 849 F.3d at 35; Randle v. Alexander, 960 F. Supp. 2d 457, 481 (S.D.N.Y. 2013) ("disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim.").

Plaintiff's claim that Dr. Fricke should have known about his diabetes because of his symptoms fails for three reasons. First, plaintiff did not present with typical diabetic symptoms during either visit with Dr. Fricke (Dkt. No. 47-9 at 71, 132) or visits with nursing staff before June 3, 2016. See Dkt. No. 47-9 at 1-141. Plaintiff did complain about vision trouble, eye pain, nausea, constipation, trouble breathing, and extreme dizziness while at RCJ. Id. As a result of his complaints, plaintiff stopped taking his beta blockers, and Dr. Fricke referred him to a cardiologist. Id. at 113. Plaintiff also

complained that when his HCTZ medication was doubled, his symptoms worsened.  Id. at 132.  However, plaintiff does not show that these symptoms and complaints were indicative of diabetes or that his high blood pressure should have led Dr. Fricke to discover or diagnose his diabetes.  See Dkt. Nos. 1, 22, 52, 61.  Additionally, Dr. Fricke notes that plaintiff did not present with key symptoms of diabetes, such as increased urination, or lesser symptoms, such as vomiting, weight loss, or lethargy, at his June 1, 2016, appointment.  Dkt. No. 47-11 at ¶ 93.  Second, plaintiff was confrontational during his June 1, 2016, appointment, which prevented Dr. Fricke from assessing fully plaintiff's condition or symptoms.  Id. at ¶ 76.  Third, plaintiff had no medical history of diabetes.  Dkt. No. 47-9 at 8.  Absent a diabetic history and diabetic symptoms, Dr. Fricke had no reason to test plaintiff for diabetes. See Dkt. No. 47-11 at ¶ 93; Dkt. No. 47-12 at ¶ 26.  Even if, in hindsight, it can be argued that certain complaints plaintiff made should have led Dr. Fricke to realize that plaintiff was diabetic, because plaintiff did not have a diabetic history or the usual diabetic symptoms, as Dr. Fricke continued to treat plaintiff and attempt to respond to his complaints, his failure to identify any symptoms as signs of diabetes does not demonstrate intentional or reckless failure to act with reasonable care.  See, e.g., Sheils v. Flynn, 9:06-CV-407, 2009 WL 2868215, at *17 (N.D.N.Y. Sept. 2, 2009) ("While Defendants' failure to immediately diagnose the lesion on Plaintiff's shoulder as cancer was undoubtedly frustrating and frightening for Plaintiff, the record simply does not indicate any behavior on Defendants' part that elevates the situation from possible medical malpractice to the level of a constitutional violation. Plaintiff received frequent medical care, as his voluminous medical records

demonstrate. Medical staff prescribed various medications in an attempt to relieve his symptoms.").

Once Dr. Fricke was notified of plaintiff's elevated blood glucose level, he immediately had plaintiff transported to the hospital.  Dkt. No. 47-9 at 133.  Due to the lack of typical diabetic symptoms, known positive test results, and no medical history of diabetes, plaintiff cannot satisfy the *mens rea* prong as plaintiff cannot show that Dr. Fricke "acted intentionally to impose the alleged condition or recklessly failed to act with reasonable care."  Darnell, 849 F.3d at 35.

Plaintiff's allegations could be construed as suggesting that Dr. Fricke had a duty to seek out the lab results, even if he had no reason to think they were abnormal.  See Dkt. No. 62 at 4.  However, even if Dr. Fricke "misdiagnosed" plaintiff and that misdiagnosis caused plaintiff unintended harm, or if Dr. Fricke were negligent in failing to seek out the results of plaintiff's blood work, his conduct is at most negligence, as he had no reason to suspect that plaintiff had diabetes before June 3, 2016.

> It has . . . been held that a delay in medical treatment may constitute deliberate indifference, but that "such a classification is reserved for 'cases in which, for example officials deliberately delayed care as a form of punishment; ignored a life-threatening and fast degenerating condition for three days; or delayed major surgery for over two years.'"

Allen, 2006 WL 2376927, at *4 (quoting Magee v. Childs, No. CIV904CV1089 (GLS/RFT), 2006 WL 681223, at *12 (N.D.N.Y. Feb. 27, 2006), Freeman v. Strack, No. 99 Civ. 9878(AJP), 2000 WL 1459782, at *6 (S.D.N.Y. Sept. 29, 2000)).

> "Thus, a physician who 'delay[s] . . . treatment based on a bad diagnoses or erroneous calculus of risks and costs' does not exhibit the mental state necessary for deliberate indifference." Harrison, 219 F.3d at 129.  Likewise, an inmate who disagrees with the physician over the appropriate course of

treatment has no claim under Section 1983 if the treatment provided is "adequate."

Groves v. Davis, No. 9:11-CV-1317 (GTS/RFT), 2012 WL651919, at *5 n.9 (N.D.N.Y. Feb. 28, 2012).

Here, plaintiff presents no argument or evidence to even suggest that Dr. Fricke intentionally failed to diagnose his diabetes as a form of punishment. Thus, the two-week delay in diagnosis is, at most, a "bad diagnosis or erroneous calculation of risks and costs," Harrison, 219 F.3d at 139, and plaintiff cannot demonstrate that Dr. Fricke had the requisite mental state. Groves, 2012 WL651919, at 5 n.9. Further, negligence is not actionable under § 1983. See Grimmet v. Corizon Med. Assocs. of N.Y., No. 15-CV-7351 (JPO)(SN), 2017 WL 2274485, at *5 (S.D.N.Y. May 24, 2017) ("[N]egligence alone is insufficient to make out a deliberate indifference claim under the Fourteenth Amendment."); Burroughs v. Petrone, 138 F. Supp. 3d 182, 211 (N.D.N.Y. 2015) ("Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing the harm.") (internal quotation marks and citation omitted); Roberts v. City of New York, 1:14-CV-5198 (GHW), 2016 WL 4146135, at *6 (S.D.N.Y. Aug. 2, 2016) (Where the plaintiff contended that the defendant misdiagnosed him with gas when he was experiencing elevated blood sugar levels as a result of diabetes, the Court noted, "even if [the defendant medical professional] was negligent in failing o properly diagnose Plaintiff's symptoms and failing to prescribe the proper medication, the complaint fails to state a claim for deliberate indifference" because negligence, even if it amounts to medical malpractice, does not, without more, rise to the level of a constitutional claim).

As such, plaintiff has failed to demonstrate that Dr. Fricke "acted intentionally to impose the alleged condition or recklessly failed to act with reasonable care." <u>Darnell</u>, 849 F.3d at 35. For the reasons stated, plaintiff does not satisfy the requirements of the *mens rea* prong. Accordingly, as the undersigned concludes that there is no genuine dispute of material fact with respect to either the objective or *mens rea* prongs, plaintiff fails to establish a deliberate indifference claim. Accordingly, it is recommended that Dr. Fricke's motion for summary judgment be granted.

## IV. CONCLUSION

**WHEREFORE**, for the reasons stated herein, it is hereby:

**RECOMMENDED**, that defendant's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 (Dkt. No. 47) be **GRANTED**; and it is

**RECOMMENDED**, that the John and Jane Doe defendants be *sua sponte* **DISMISSED** from this action without prejudice, due to plaintiff's failure to identify and serve these defendants, and it is further

**RECOMMENDED**, that plaintiff's submission, dkt. no. 62, be construed as supporting his response in opposition to defendant's Motion for Summary Judgment; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall

be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**.  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.[12]

Dated: July 26, 2019
Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

---

[12] If you are proceeding pro se and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation and Order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Id. § 6(a)(1)(C).